David Bloch (SBN 184530)
blochd@gtlaw.com
GREENBERG TRAURIG, LLP
101 Second St., Suite 2200
San Francisco, California 94105
T: 415.590.5110 F: 415.707.2010

Colin W. Fraser (SBN 266876)
frasercw@gtlaw.com
GREENBERG TRAURIG, LLP
18565 Jamboree Road Suite 500
Irvine, CA 92612
T: 949-732-6500 F: 949-732-6501

Attorneys for Plaintiff
DRYFT SCIENCES, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DRYFT SCIENCES, LLC, | CASE NO. |
| Plaintiff, | **COMPLAINT FOR ANTITRUST** |
| v. | **AND STATE LAW VIOLATIONS** |
| SWEDISH MATCH NORTH AMERICA, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

**<u>COMPLAINT</u>**

1.    Plaintiff Dryft Sciences, LLC, by and through its undersigned counsel, for its Complaint against Defendant, Swedish Match North America, LLC ("SM") alleges, based on personal knowledge as to itself and information and belief as to all other matters, as follows:

**INTRODUCTION**

2.     This case arises out of the unlawful and anticompetitive activities of a monopolist, SM, which controls at least 80% of the market for tobacco-derived nicotine pouch products ("NP Products") in the United States. In an effort to keep it that way and even expand its monopoly position, SM pursued a series of sham legal actions against Dryft.

3.     SM filed a series of costly, time-consuming and baseless legal actions against Dryft to impede Dryft's ability to compete, raise Dryft's costs, limit investment by third parties, distract its business focus, interfere with its business relationships and opportunities, and effectively drive it from the market by forcing it to sell its business at a discount.  SM brought these legal actions against Dryft because it knew it could not compete fairly with Dryft based on the qualities and price of its NP Product, ZYN. In a candid admission, SM publicly expressed its intent to unlawfully eliminate the product DRYFT from the Relevant Market (defined below) in an "Other Tobacco Products" (or "OTP") Convenience Industry Report presentation, dated September 16, 2020, made at one or more industry trade shows, in which SM's Director of Category Management stated "[**DRYFT] could be the first brand casualty.**"

4.     SM's sham legal actions against Dryft were but one aspect of a premeditated, multi-pronged, multi-year campaign of harassment and intimidation that SM and its affiliates set in motion against Dryft and its associates, vendors, and affiliates, to maintain and expand its monopolist position in the NP Products market in the United States. These efforts included suits against Dryft's contract manufacturer in Sweden, as well as ignoring the clear implications of a 2017 Settlement Agreement between SM and Dryft's parent company.

5.     When Dryft entered the NP Products market in the United States in 2016, it leveraged its innovative product design and competitive pricing, making it a legitimate threat to SM's market dominance. Fearing that the DRYFT product would

seriously threaten its monopoly, and because SM had no desire to legitimately compete with Dryft in the Relevant Market, SM leveraged its size and significant resources to attack Dryft and its associates in a premeditated and multi-pronged scheme to force Dryft out of the Relevant Market.  Indeed, in addition to the baseless legal actions filed against Dryft, SM also embroiled Dryft's contract manufacturer in Sweden in costly litigation in that country.

6.    Most importantly, SM's pattern of anticompetitive actions seeking to stifle competition and bully a smaller market participant, seriously harmed consumers. As baseless as they were on the merits, SM's efforts effectively forced Dryft out of the Relevant Market and have limited consumer choice to four products instead of five. Consumers had to purchase SM's more expensive, ZYN brand, which remains dominant in the NP Product market. SM's *modus operandi* was and is to operate in an unfair and predatory fashion against competitors – particularly smaller competitors with fewer resources – to eliminate them to the detriment of consumers, including by turning to meritless, indeed, abusive litigation.

7.    For the reasons set forth below, SM's bad acts give rise to meritorious claims and recovery by Dryft for violation of Section 2 of the Sherman Act and the California Cartwright Act for protecting and expanding its monopoly, or attempting to monopolize, as well as tortious interference with a prospective economic advantage.

## **PARTIES**

8.    Plaintiff Dryft is a limited liability company organized and existing under the laws of California, having a principal place of business at 5455 Endeavour Court, Moorpark, California 93021.

9.    Defendant SM is a limited liability company organized and existing under the laws of Delaware, having a principal place of business at 1021 E. Cary Street, Suite 1600, Richmond, Virginia 23219.  SM is a wholly owned subsidiary of Swedish Match AB, a Swedish multinational tobacco company headquartered in Stockholm.

## JURISDICTION AND VENUE

10. Dryft brings this action under Sections 4 and 16 of the Clayton Antitrust Act ("Clayton Act"), 15 U.S.C. §§ 15 and 26, to remedy violations of Section 2 of the Sherman Act ("Sherman Act"), 15 U.S.C. §2, and the California Cartwright Act ("Cartwright Act"), Cal. Bus. & Prof. Code §§ 16700, et seq. Dryft also asserts state tort law claims.

11. Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(a)(1), 1337, and 1367. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Dryft asserts claims arising under federal antitrust laws; specifically, Dryft brings this action under the Clayton Act to remedy SM's violations of the Sherman Act. This Court has supplemental jurisdiction over Dryft's state-law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

12. This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, as to Defendant.

13. Personal jurisdiction over Dryft's federal antitrust claims is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, because SM transacts business in this district and is found here. Among other things, SM or its agents sell NP Products within this district. SM has a dedicated sales representative for the Central California area.

14. Personal jurisdiction over Dryft's state tort law claims is proper because Defendant committed tortious acts that were deliberately aimed at a California plaintiff, and Defendant had California contacts related directly to the allegations in Dryft's claims, as described more fully below.

15. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, because SM transacts business and is found here.

16.     Additionally, or alternatively, venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTS

### The Relevant Market

17.     Due to regulatory, and other constraints, the geographic scope for the Relevant Market for NP Products is the entire United States (the "Relevant Geographic Market"). NP Products have been sold in all fifty states for many years, and Dryft, SM, and other competitors competed for customers for NP Products in all fifty states beginning in 2016.

18.     Smoking articles (*e.g.*, cigarettes and cigars) and smokeless tobacco (*e.g.*, snus, moist snuff, chewing tobacco) deliver nicotine from tobacco. Use of both types of products, however, is associated with health hazards not necessarily related to the delivery of nicotine itself. For example, tobacco smoke exposes users (and at times those around them) to numerous combustion-related toxicants, and both smoking, and the use of smokeless tobacco exposes users to carcinogens formed in tobacco leaves. Accordingly, NP Products contribute to public health as safer, non-combusted, tobacco-leaf-free alternatives for consumers. NP Products are offered with different flavors and varying levels of nicotine.

19.     NP Products became increasingly attractive to consumers as a cigarette and/or smokeless tobacco replacement because of their unique design, their convenience, their elimination of physical externalities such as air-borne smoke or saliva, and the fact that they are non-combustible. Because NP Products provide a unique and preferrable alternative, cigarettes, smokeless tobacco, and even smoking cessation items like gums or lozenges, are not reasonable substitutes for them. NP Products constitute the Relevant Product Market. The Relevant Product Market and its Relevant Geographic Market constitute the "Relevant Market," as that term is used in this Complaint.

20.   Importantly, SM exploited various barriers to entry into the Relevant Market in addition to the usual barriers such as cost of development, manufacturing and distribution, which also apply here. On May 10, 2016, the United States Food and Drug Administration ("FDA") published its "deeming regulations," which subjected – among other previously unregulated products – NP Products, to FDA regulation as "tobacco products" under Chapter IX of the Federal Food, Drug, and Cosmetic Act. Among its primary features, Chapter IX imposes requirements for premarket authorization of so-called "new tobacco products" (*i.e.*, those not commercially marketed in the United States as of February 15, 2007, or modified in any physical respect since). Within the Relevant Market, obtaining FDA authorization to market a "new tobacco product" is a costly and burdensome process that often takes many years. Only regulation-savvy, well-capitalized companies can overcome the numerous hurdles it takes to obtain authorization to market and sell such a product.

21.   When issuing the "deeming regulations," the FDA announced a compliance policy generally allowing companies to market newly regulated products that qualify as "new tobacco products" as long as such products were available in the U.S. market by August 8, 2016. Further, the compliance policy permitted the continued marketing of such products without otherwise-required authorization during the FDA's review of a pending marketing application – such as a Premarket Tobacco Product Application ("PMTA") – provided such an application was submitted by September 9, 2020. Any NP Products that sought entry after August 8, 2016, would be barred from the Relevant Market until they received market authorization from the FDA (which again, could take years). In light of these regulatory limitations, there were only five brands of FDA-compliant NP Products in the Relevant Market on August 8, 2016, and all of them submitted a PMTA by the September 2020 deadline: SM's "ZYN," Dryft's "DRYFT," Modoral's "VELO" (owned by British American Tobacco ("BAT")), Burger Sohne's "on!" (later

purchased by Altria Group, Inc. ("Altria")), and Rogue Holdings LLC's "Rogue" (owned by Swisher International Inc.).

22. For reasons having nothing to do with the price or quality of its NP Product, SM has obtained a share of at least 80% of the Relevant Market, and SM presently has, and has always had, the highest-priced product in the Relevant Market. SM is a part of a much larger, deep pocketed organization – its parent company Swedish Match AB is listed on Nasdaq Stockholm, and most of its sales are in the U.S. and Scandinavia. Swedish Match AB has about 8,000 employees, and its market cap is over 100 billion SEK (or just under 10 billion USD).  Swedish Match AB is known as a member of "Big Tobacco".

23. Given the clear pattern of bad acts deployed by SM, Dryft states, on information and belief, that SM's actions against Dryft have been undertaken with the specific intent to impact price, supply and competition in the Relevant Market, to drive competitors from the Relevant Market, and to maintain or increase SM's market share and market power in the Relevant Market.

**DRYFT Is a Unique Product**

24. Historically, Kretek International, Inc. ("Kretek") (the private entity that eventually spun off Dryft Sciences LLC and the product DRYFT into a separate entity) was an importer, marketer, distributor, and manufacturer of specialty tobacco products (pipe tobacco, cigars, lighters, hand-rolled cigarettes, among other items).

25. In 2016, Kretek began distributing and selling DRYFT in the United States. At that time, DRYFT was manufactured in Sweden by The Art Factory AB, an entity that was owned or otherwise associated with Mr. Thomas Eriksson—a pioneer in alterative nicotine products and devoted to developing safer alternatives to tobacco for consumers.

26. DRYFT was an NP Product developed by Eriksson that employed the active ingredient first approved for use in Nicorette in the United States in 1984, nicotine polacrilex (as opposed to a free nicotine salt used by many of Dryft's

competitors). Nicotine polacrilex is a well-known "prior art" compound that is not subject to a patent protection. DRYFT was also a unique brand because DRYFT's pouches had either two, four or seven milligrams of nicotine per pouch. (SM and other brands offered pouches with three milligrams of nicotine per pouch ascending to six milligrams). Moreover, some brands offered only a few different flavors – DRYFT had eight, with a total of 24 different skus ("stock keeping units") on the market.

27.    Because the FDA had limited the Relevant Market based on what was available to consumers as of August 8, 2016 – competitors could not offer new flavors or potency levels – companies could only offer what they already had in the market at that given time. This provided Dryft with a distinct advantage that it could have leveraged in the Relevant Market had it had the opportunity. DRYFT's packaging also was smaller, sleeker, and contained sections where a consumer could segregate used pouches in the same receptacle that stored their remaining unused pouches – a patented innovation. DRYFT's packaging also included 20 pouches per container whereas SM's brand ZYN, for example, only had 15, and DRYFT sold at a much lower price than ZYN overall – in 2020 ZYN sold for ten to twenty cents more per pouch than its competitors. Finally, as noted above, DRYFT contained nicotine polacrilex, a safer, widely accepted, and well-known form of nicotine that has been used in dozens of products (like Nicorette gum, and other gums and lozenges) for years. (Indeed, the DRYFT competitor Rogue also uses nicotine polacrilex and has never been sued by SM for patent infringement.) In contrast, ZYN and on! use nicotine salt—a form of nicotine also used in certain vaping products and hence under additional scrutiny for health-and-safety reasons.

28.    Use of nicotine polacrilex versus nicotine salt is key to the disputes between SM and Dryft. One of Eriksson's companies developed ZYN and then sold the rights to SM before the development of DRYFT.[1]  This transaction included a

---

[1] Specifically, TillCe AB developed ZYN (which contains nicotine salt) in collaboration with Burger Sohne.  TillCe later spun the ZYN-related assets into a

patent (the "'908 Patent"), directed generally to NP Products containing nicotine salts and methods of manufacturing them. From the face of SM's '908 Patent, it is clear that the nicotine salt intellectual property purchased by SM was entirely distinct from the substance used in the DRYFT product. DRYFT was produced for Kretek by different Eriksson companies[2] using a nicotine polacrilex complex that was well known in the prior art, and as stated in SM's '908 Patent, was "not a nicotine salt as in the disclosed invention."

### SM Begins a Premeditated, Multi-Pronged Campaign Against Dryft and its Associates and Affiliates

29.   Given the significant advantages of Dryft's many offerings, SM recognized DRYFT as a major competitive threat in the Relevant Market and sent Kretek a cease-and-desist letter in 2017 (the "2017 Letter") – an early example of SM's bad acts, to disrupt and destroy Dryft and limit competition in the Relevant Market. The 2017 Letter broadly claimed that Kretek infringed various intellectual property rights related to ZYN. Rather than spend time and energy fighting the meritless allegations, Kretek and SM entered into a Settlement Agreement in August 2017 (the "2017 Settlement Agreement") requiring DRYFT to change its label and disclose the name of its contract manufacturer. In exchange, SM provided a broad release to Kretek of all known and unknown claims against it.

30.   Kretek continued to import DRYFT manufactured by The Art Factory into the Relevant Market, but it became apparent that The Art Factory was not able to meet the growing demand for DRYFT in the Relevant Market because Swedish Match North Europe AB ("SMNE") – as part of Swedish Match's broad scheme against Dryft and its associates and affiliates – had brought a separate arbitration

---

holding company called NYZ AB and then sold NYZ AB to Swedish Match.
[2] Art Factory AB sold DRYFT (which contains nicotine polacrilex) to Kretek on a purchase-order basis starting in 2016.  Later, The Art Factory AB manufactured DRYFT for Kretek.

claim against TillCe AB and Eriksson, accusing them of breach of contract.[3]  Eriksson had to devote time and resources that he otherwise could have invested in expanding and upgrading his manufacturing facility to defending against SMNE's proceeding.

31.    In 2019, Kretek decided it would begin manufacturing DRYFT in the United States through a newly formed subsidiary, Dryft Sciences LLC.  The 2017 Settlement Agreement was an important precursor to the decision to create Dryft Sciences. After the settlement, Kretek increased its investment in and focus on DRYFT with the understanding that SM had agreed to a broad release of claims. Kretek never would have formed Dryft Sciences or commenced manufacturing DRYFT in the United States without SM's agreement to that broad release of claims.

## SM Filed a Series of Baseless Actions Against Dryft

32.    In a September 2019 press release, Kretek announced the formation and spin off of Dryft Sciences. The release made clear that Dryft would be substantially expanding its manufacturing capacity in the United States with a new manufacturing site, and that it anticipated manufacturing 30 million cans of DRYFT in 2020 and 60 million cans in 2021. Indeed, the press release makes clear that Dryft Sciences eventually intended to expand the brand globally.

33.    Shortly following this press release, SM commenced the next step of its multifaceted campaign against Dryft. On February 10, 2020, SM and its related entities[4] (collectively the "ITC Complainants"), asked the International Trade Commission ("ITC") to investigate Dryft and its related entities, (collectively the

---

[3] The complaint that SM submitted to the International Trade Commission (discussed below) notes at paragraph 41 that "The Swedish counterpart to the '908 patent (SE 535 587) was recently involved in a first arbitration proceeding in Sweden between Swedish Match North Europe, TillCe, and Thomas Eriksson."  Art Factory and The Art Factory were not involved in this proceeding.

[4] Specifically, Pinkerton Tobacco Co., L.P., Swedish Match North America, and NYZ AB, as well as a non-party wm17 holdings GmbH.

"ITC Respondents")[5] for importing allegedly patent-infringing NP Products (the "ITC Action").

34.   On that same day, SM and a group of plaintiffs[6] also sued Dryft and related entities[7] for infringement of the same patent in the United States District Court for the Central District of California (the "California Action").

35.   Then, just *two* days after bringing a patent infringement suit in California, a subset of those plaintiffs[8] filed trade secret misappropriation claims under Kentucky and federal law against Kretek and Dryft in the Western District of Kentucky (the "Kentucky Action").

36.   By filing *three* back-to-back legal actions in three different venues, SM was using and abusing the United States' legal processes to harass and financially devastate a competitor in the Relevant Market by ensnaring it in baseless legal complications. Because of SM's actions, Dryft was never able to manufacture or sell the amount of product it reasonably anticipated it would when it issued its September 2019 press release.

37.   The basis for all three actions was the DRYFT product and its alleged infringement of SM's '908 Patent and misappropriation of trade secrets relating to its manufacturing process. But SM clearly knew that its '908 Patent did not apply to the nicotine polacrilex complex used in DRYFT because the '908 Patent affirmatively states on its face that nicotine polacrilex complex is excluded from its protection, thus the multiple actions accusing Dryft of various violations of intellectual property rights were entirely frivolous and lacked any evidentiary support.

38.   As noted above, SM had agreed to a broad release of claims against Kretek (and therefore by extension Dryft), in the 2017 Settlement Agreement.  SM,

---

[5] Kretek and The Art Factory AB.
[6] Pinkerton, Swedish Match North America, NYZ and wm17 holdings.
[7] Kretek, The Art Factory, and TillCe.
[8] Pinkerton, Swedish Match North America, and NYZ.

however, ignored the fact that their claims in all three actions were baseless, and that they were barred by the 2017 release.  It did not matter to SM which was bent on its plan to destroy Dryft and consolidate its monopoly in the Relevant Market, and it was implementing that plan step by step.

39.   SM's ability to successfully intimidate or harm other competitors in the Relevant Market with sham legal actions was limited as the other competitors (aside from Dryft) were owned by "Big Tobacco" companies with their own well-staffed legal departments and significant financial resources to fight such frivolous claims. (Indeed, in 2019 Altria purchased on! from Burger Sohne – and as a co-patent holder with SM of the '908 Patent, is co-plaintiff against Dryft in the three actions.) But a smaller, independent company like Dryft (which had only one part-time attorney on staff), was a prime target.

40.   After the filing of the three frivolous actions, Dryft immediately fielded multiple inquiries from various suppliers, creditors, media outlets, retail partners and potential capital partners who expressed concern over the viability and integrity of Dryft in light of SM's public allegations. Dryft's reputation and business relationships began to suffer in quantifiable ways, discussed in detail below. Indeed, Dryft was forced to hire a crisis management company to assist it with the negative publicity, groundswell of questions and other major repercussions resulting from the filing of the three actions, as baseless as they were.

### The ITC Action Was Objectively and Subjectively Baseless

41.   Shortly after the ITC Complainants filed the ITC Action, Dryft sent a detailed letter to the ITC Complainants, noting how the accused DRYFT product could not possibly infringe the asserted claims under *any* reasonable claim construction because DRYFT contained nicotine polacrilex complex, which is not a "nicotine salt" as defined by SM's '908 Patent.  The specification of the '908 Patent clearly stated that compositions for oral delivery of nicotine using nicotine polacrilex complex were "**not a nicotine salt as in the disclosed invention.**" There was simply

no basis for the ITC Complainants' claim. But SM and the other ITC Complainants largely ignored Dryft's letter.

42.    In the ensuing weeks and months, Dryft diligently defended its case. The parties to the ITC Action engaged in substantial claim construction activity. Most importantly, they sparred over whether a product containing a nicotine polacrilex complex (such as DRYFT) is or is not a "free nicotine salt." This question is dispositive of the plaintiffs' infringement allegations: if nicotine polacrilex is not a free nicotine salt, then the DRYFT product cannot infringe the '908 Patent (nor can its manufacturing process copy SM's trade secrets). In the end, the ITC Defendants and the ITC Staff Attorney both agreed that the '908 Patent's claims do not encompass the nicotine polacrilex complex found in DRYFT.

43.    In ITC proceedings, the Staff Attorney is an attorney appointed by the Office of Unfair Import Investigations to act as an independent litigant representing the public interest. The Staff Attorney is a full party to the investigation and is expected to help create a complete record on all contested issues, including claim construction—and the Staff Attorney's voice carries significant weight with the Commission. And while an ITC ruling that DRYFT does not infringe the '908 Patent would not bind a district court, a well-reasoned Commission decision could be persuasive. It seems that SM agreed – just two days before the joint claim construction chart memorializing the parties' positions was to be filed with the ITC, SM filed a motion to terminate the ITC Action and withdraw their complaint.

44.    Nevertheless, as a direct and proximate result of SM's multi-pronged abuse of the litigation process against Dryft, including but not limited to the ITC Action, Dryft was damaged because the costs and burdens of Dryft's participation in the Relevant Market dramatically increased, as it was distracted from its core business due to the ITC Action, faced supplier and potential investor concerns, and had to pay significant legal fees. Because of the costs associated with SM's legal actions, Dryft was not in a position to further invest in the business itself, nor did it obtain capital

from outside investors. Dryft therefore pivoted strategically and agreed to entertain offers from potential acquirers. Ultimately, Dryft's innovative and less expensive DRYFT product was effectively forced out of the Relevant Market due to SM's ITC Action (among others) when it was sold to BAT at a fraction of its pre-litigation value, thus harming competition and consumer choice in the Relevant Market.

45.    Because it is obvious on the face of SM's '908 Patent that the nicotine polacrilex complex used in DRYFT was excluded from the '908 Patent protection, SM knew or should have known that it had no legitimate grounds to bring the ITC Action. SM filed the ITC Action with the objective of distracting Dryft from its core business, and to cause Dryft to incur costly and time-consuming legal expenses in defending itself from an objectively and subjectively baseless legal action.

### The California Patent Action Was Objectively and Subjectively Baseless

46.    Despite the outcome of the ITC Action, SM chose to continue to pursue its baseless patent infringement claims in the California Action, to attempt to maintain its dominant position in the Relevant Market, even though it knew or should have known that its claims in the California Action had no merit for the same reasons identified in the ITC Action.

47.    Given the plain language of SM's '908 Patent, the California court ultimately confirmed that SM and its co-plaintiffs in the California Action **had no basis to bring their patent infringement claims**. In its decision, the Court relied on the same reasoning that Dryft had submitted to SM and its various co-plaintiffs since the beginning, concluding that "[a] review of the specification demonstrates that it affirmatively limits the scope of [the] nicotine salt [patent] to exclude such complexes [like nicotine polacrilex used in DRYFT] by distinguishing them from what is claimed and by affirmatively stating they are excluded." The Court then held that the '908 Patent was affirmatively limiting and the only reasonable interpretation was to conclude that nicotine polacrilex, the substance used in DRYFT, was not within the scope of SM's patent.

48.   As a direct and proximate result of SM's multi-pronged campaign against Dryft, including but not limited to the California Action, Dryft was damaged in multiple respects. The costs and burdens of Dryft's participation in the Relevant Market dramatically increased, as it was distracted from its core business due to the California Action, faced supplier and potential investor concerns, and had to pay significant legal fees. Because of the costs associated with SM's legal actions, Dryft was not in a position to further invest in the business itself as it otherwise would have done. Nor did it obtain capital from outside investors.   Dryft therefore pivoted strategically and agreed to entertain offers from potential acquirers. Ultimately, Dryft's innovative and less expensive DRYFT product was effectively forced out of the Relevant Market due to SM's California Action (among others) when it was sold to BAT at a fraction of its pre-litigation value, thus harming competition and consumer choice in the Relevant Market.

49.   Because it is obvious on the face of SM's '908 Patent that the nicotine polacrilex complex used in DRYFT was excluded from the '908 Patent protection, SM knew or should have known that it had no legitimate grounds to bring the California Action. SM filed the California Action with the objective of distracting Dryft from its core business, and to cause Dryft to incur costly and time-consuming legal expenses in defending itself from an objectively and subjectively baseless legal action. SM also has chosen to double-down on its baseless claims by filing an appeal of the Court's decision in the California Action which remains pending.

**Filing the Trade Secret Action in Kentucky Was**
**Objectively and Subjectively Baseless**

50.   Two days after filing both the California Action and the ITC Action, SM and its co-plaintiffs[9] filed yet a third suit against Dryft and Kretek (the "Kentucky

---

[9]Pinkerton, Swedish Match North America, and NYZ.

Action"), even though, during the initial status conference in the ITC Action, SM conceded it could have brought the trade secret claims as part of the ITC investigation.

51.   SM knew or should have known that it had no legitimate grounds to bring the Kentucky Action because Dryft has no connection to the state of Kentucky. But as part of its premeditated, multi-pronged campaign against Dryft, SM brought its baseless trade secrets claim in Kentucky arguing that SM had invested significant sums in the community where the Kentucky court sits.

52.   The Kentucky court rejected SM's meritless jurisdictional claims, and did not even reach the merits of the case. Instead, based on the obvious lack of personal jurisdiction over Dryft, a resident of California, it transferred the action to the United States District Court for the Central District of California. The Court made clear that SM had improperly filed suit in Kentucky, as there was no sufficient nexus between SM's trade secret misappropriation claims and the "use" of an alleged trade secret in Kentucky. The court also noted that "Plaintiffs do not allege the harm [due to alleged misappropriation of trade secrets] occurred in Kentucky. Rather, Plaintiffs focus on Defendants' website-based sales and marketing in Kentucky as the basis for personal jurisdiction. The Complaint never marries the two concepts" and therefore, "the Complaint cannot support a reasonable inference that Plaintiffs' trade secret claim, 'originates from' Defendants' marketing and sales in Kentucky."

53.   The same Court presiding over the California Action where judgment already has been entered in Dryft's favor also is presiding over the transferred Kentucky Action, where discovery is underway even though a nicotine *polacrilex* NP Product cannot (and DRYFT does not) rely on trade secrets used to make a nicotine *salt* product.

54.   Because Dryft has no connection to the state of Kentucky, of course no misappropriation would have occurred in Kentucky. Thus, SM knew or should have known that it had no legitimate grounds to bring the Kentucky Action. But SM had the resources to file a baseless lawsuit in a jurisdiction with no connection to Dryft

on the off chance that it would move forward there.  And even if the Kentucky Action was transferred it remained a successful part of SM's multifaceted campaign against Dryft, forcing a small, independent company to spend time and resources defending an objectively and subjectively baseless lawsuit.

55.    These three actions completely disrupted Dryft's business operations, detracted from its business valuation, and forced Dryft to incur significant expenses. Dryft is a small independent company with a limited number of employees and one part-time in-house counsel. During the pendency of SM's three sham legal actions, Dryft executives devoted hours every day to working on the company's defense, liaising with outside counsel, and attempting to reassure potential investors as well as suppliers, customers and vendors, that Dryft was not a bad actor. Moreover, capital that otherwise would have been reinvested in the business, including in key sales and marketing efforts to obtain additional customers and better shelf-placement for DRYFT, as well as the new manufacturing facility, was diverted to defending the company. SM's unlawful and anticompetitive actions thus reduced or destroyed competition in the Relevant Market or created the dangerous probability of doing so.

56.    As objectively and subjectively baseless litigation, the three legal actions pursued by SM for improper reasons fall outside any immunity for statements or conduct in connection with legal proceeding.

**SM's Sham Actions Harmed Dryft and Consumers**

57.    Prior to SM's commencement of a series of utterly baseless legal actions against it, Dryft had one of the highest future values of an NP Product company in the Relevant Market – in early 2020 it had an estimated valuation in excess of $458 million dollars. DRYFT was a unique product that presented a safer, non-combustible alternative to cigarettes and other traditional tobacco products, and offered multiple flavors and levels of nicotine in a can with a patented design. In addition, DRYFT used the safer, accepted, and well-known nicotine polacrilex ingredient, approved for use by the FDA since 1984. Moreover, its parent company Kretek has had decades of

experience in the highly regulated distribution of tobacco products across the entire United States, and also has the required licenses to sell tobacco in each of the 50 states. Dryft's combination of superior product as well as logistical and regulatory expertise was extremely enticing to investors – that is, before SM's premeditated campaign to destroy Dryft and control the Relevant Market fully took shape.

58.   But SM's legal actions were successful at distracting Dryft from building its business, and forced it to spend money – money that it otherwise would have used to invest and expand the business, improve marketing and product placement, and upgrade its new manufacturing facility – on defending against them.

59.   After announcing its plans for its new domestic manufacturing facility in September 2019, Dryft planned to raise capital to fund its expansion in the Relevant Market, as well as to continue to upgrade the new manufacturing facility. But just a few months later, SM's three groundless legal actions against Dryft clouded its reputation, and potential investors were reluctant to financially support a new company with significant contingent legal risk looming over it.

60.   To be sure, the opportunity in the marketplace was robust. In 2019, Altria acquired 80% of on!, another NP Product with *lower* sales and a *shorter* market history than DRYFT, for $375 million. (Altria only purchased the portion of the business related to on! NP Products.)

61.   When the investors declined to proceed with Dryft, due to the myriad potential issues created by SM, Dryft had no choice but to seek potential strategic acquirers for the company, because it was increasingly hamstrung by SM's legal actions and determined that an entity with more financial resources would be in a better position to expand the company in the Relevant Market. But at least three good-faith negotiations between Dryft and potential acquirers failed in direct response to SM's legal actions. Due diligence calls focused on SM's legal actions and included substantive discussions with the potential acquirers' legal teams. While counsel for the potential acquirers uniformly recognized the baselessness of each of SM's legal

actions, the costs and uncertainty they caused made DRYFT an unattractive acquisition opportunity.

62.    Finally, after negotiations failed with several other entities, Dryft was forced into a sale with BAT at a steep discount. BAT already had a product in the Relevant Market – VELO – but BAT purchased DRYFT because it recognized that DRYFT was a superior product to its own.  BAT, however, was unwilling to pay fair market value for Dryft due to the contingent risk presented by SM's legal actions.

63.    BAT purchased DRYFT for $150 million in 2020 – over $300 million dollars less than its estimated value prior to SM commencing its campaign against Dryft, and $225 million dollars less than the purchase price of the similar but inferior on! product.

64.    After the sale to BAT closed in October of 2020, the Relevant Market then shrank from five products to four when BAT decided to eliminate the DRYFT brand, folding it into the VELO line. Moreover, SM has been able to consistently hold the line on ZYN's prices because it maintains such a dominant force in the Relevant Market – with over 80% market share and key prime positioning in vendor locations. In 2020, ZYN cost ten to twenty cents more per pouch than competitors, and yet other smaller NP Products (including BAT's VELO and VELO MAX) struggle in the Relevant Market, and have decreased their prices, including offering "two-for-one" promotional schemes to try to remain competitive.

65.    Indeed, SM has been very successful with its scheme, and it ensured that its September 2020 prediction that "**[DRYFT] could be the first brand casualty**" came true. Moreover, in a 2022 edition of *CSP Magazine*, an industry periodical that covers convenience stores in the Relevant Market, an advertisement for ZYN stated that "78% of all nicotine pouch products come from ZYN," and notes that on! represents 10.5% of the market, Rogue 6% and Velo 5.5%. Dryft estimates that ZYN's actual share of the Relevant Market is higher than 78%.

66.    SM's illegal scheme against Dryft naturally harmed consumer choice, price competitiveness, and ultimately reduced or destroyed competition in the Relevant Market, or at least created a dangerous probability of doing so.

## COUNT I – PROTECTION AND EXPANSION OF A MONOPOLY AND ATTEMPTING TO MONOPOLIZE IN VIOLATION OF SHERMAN ACT (15 U.S.C. §2)

67.    Dryft incorporates all preceding paragraphs by reference.

68.    SM used objectively baseless legal actions as a strategy to eliminate Dryft from the Relevant Market. Dryft sought to expand consumer choice and reduce prices for its NP Product in the Relevant Market, and quickly found itself ensnared in costly and time-consuming legal actions, designed to impede Dryft's ability to compete, raise Dryft's costs, distract its business focus, and interfere with its business relationships and opportunities.

69.    Through such illegal conduct, SM sought to obtain monopoly power over the sale of NP Products within the Relevant Market, and has reduced or destroyed competition in the Relevant Market, or created a dangerous probability doing so, with the result that SM's ZYN product has over 80% market share and sells at an artificially high price.

70.    SM's market power is coupled with strong regulatory barriers to entry into the Relevant Market.

71.    Dryft and fellow former competitors, recognize the existence of the Relevant Market as an area of effective competition for NP Products due to high demand and desirability of NP Products.

72.    SM competes against other NP Products manufacturers in the Relevant Market.

73.    SM has sought to protect and expand its monopoly power over the Relevant Market by engaging in predatory, unlawful, fraudulent and/or other anti-competitive business practices, including but not limited to initiating or threatening

to initiate objectively baseless legal actions that prevent, delay or otherwise hinder a competitor from participating in the Relevant Market. Such baseless lawsuits are the means by which SM attempts to control the market of NP Products, by driving up the costs of participation in the Relevant Market for a competitor.  Moreover, these actions have reduced or destroyed competition in the Relevant Market or created a dangerous probability of success at doing so.

74.   As a result of SM's illegal actions, NP Products prices will rise to the level set by SM when any and all purported competitors are completely driven out of the market, especially as SM's ZYN has maintained its prices and competitors in the Relevant Market have reduced their prices and offered deals and discounts for their NP Products.

75.   SM's actions have prevented or suppressed competition and continue to prevent or suppress competition. SM's actions also created a dangerous probability of lessening or eliminating competition in the Relevant Market and permitted SM to seek and maintain dominant and monopolistic market position in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

76.   SM brought the ITC Action, the Kentucky Action and the California Action against Dryft when it knew that the common basis for these actions – the alleged infringement of its '908 Patent by Dryft and use of related trade secrets– was objectively and subjectively baseless. SM's '908 Patent on its face states that the nicotine polacrilex complex (the substance used in DRYFT) is excluded from the patent.

77.   Competition in the Relevant Market has suffered, and will continue to suffer, regardless of whether monopoly power is attained because through its anti-competitive activities, SM will obtain the unilateral power to set NP Products prices in the Relevant Market.

78.   SM has willfully sought to acquire and maintain a monopoly in the Relevant Market through predatory, unlawful, fraudulent and/or other anti-

competitive business practices. SM's intent to monopolize can be inferred from the nature of its illegal conduct, in both the number of its legal actions against Dryft and the complete lack of merit in each.

79.    SM's intent, power, and resources successfully monopolize the Relevant Market, or create a dangerous probability that it will succeed in monopolizing the Relevant Market, causing the significant anticompetitive consequences described above.

80.    SM's illegal conduct is not exempted from the Sherman Act or any other anti-trust law because it has sought to obtain that monopoly through illegitimate means and for illegitimate purposes. In particular, if competitors (like Dryft) or their contractors or designated agents attempt to take a larger share of the market, SM files objectively baseless lawsuits, which have nothing to do with the legitimate goals of SM or the purpose of patent protection.

81.    Dryft is a "person" entitled to sue under 15 U.S.C. § 15 because it has been injured as a direct result of SM's antitrust violations described herein. Dryft's injury was caused by being forced by SM to defend costly and time-consuming sham legal actions, which were intended to, and did in fact, have an illegitimate, anticompetitive effect. Because of SM's unlawful actions, Dryft was effectively forced to exit the Relevant Market and sell itself to a third party at a discount.

82.    As a proximate result of the wrongful acts herein alleged, Dryft has been damaged in an amount to be determined at trial.

## COUNT II – PROTECTION AND EXPANSION OF A MONOPOLY AND ATTEMPTING TO MONOPOLIZE IN VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT

83.    Dryft incorporates all preceding paragraphs by reference.

84.    SM used objectively baseless legal actions as a strategy to eliminate Dryft from the Relevant Market. Dryft sought to expand consumer choice and reduce prices

for its NP Product in the Relevant Market, and quickly found itself ensnared in costly and time-consuming legal actions, designed to impede Dryft's ability to compete, raise Dryft's costs, distract its business focus, and interfere with its business relationships and opportunities.

85. Through such illegal conduct, SM sought to obtain monopoly power over the sale of NP Products within the Relevant Market, and has reduced or destroyed competition in the Relevant Market, or created a dangerous probability doing so, with the result that SM's ZYN product has over 80% market share and sells at an artificially high price.

86. SM's market power is coupled with strong regulatory barriers to entry into the Relevant Market.

87. Dryft and fellow former competitors, recognize the existence of the Relevant Market as an area of effective competition for NP Products due to high demand and desirability of NP Products.

88. SM competes against other NP Products manufacturers in the Relevant Market.

89. SM has sought to protect and expand its monopoly power over the Relevant Market by engaging in predatory, unlawful, fraudulent and/or other anti-competitive business practices, including but not limited to initiating or threatening to initiate objectively baseless legal actions that prevent, delay or otherwise hinder a competitor from participating in the Relevant Market. Such baseless lawsuits are the means by which SM attempts to control the market of NP Products, by driving up the costs of participation in the Relevant Market for a competitor.  Moreover, these actions have reduced or destroyed competition in the Relevant Market or created a dangerous probability of success at doing so.

90. As a result of SM's illegal actions, NP Products prices will rise to the level set by SM when any and all purported competitors are completely driven out of the market, especially as SM's ZYN has maintained its prices and competitors in the

Relevant Market have reduced their prices and offered deals and discounts for their NP Products.

91.    SM's actions have prevented or suppressed competition and continue to prevent or suppress competition. SM's actions also created a dangerous probability of lessening or eliminating competition in the Relevant Market and permitted SM to seek and maintain dominant and monopolistic market position in violation of California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, *et seq.*).

92.    SM brought the ITC Action, the Kentucky Action and the California Action against Dryft when it knew that the common basis for these actions – the alleged infringement of its '908 Patent by Dryft and use of related trade secrets– was objectively and subjectively baseless. SM's '908 Patent on its face states that the nicotine polacrilex complex (the substance used in DRYFT) is excluded from the patent.

93.    Competition in the Relevant Market has suffered, and will continue to suffer, regardless of whether monopoly power is attained because through its anti-competitive activities, SM will obtain the unilateral power to set NP Products prices in the Relevant Market.

94.    SM has willfully sought to acquire and maintain a monopoly in the Relevant Market through predatory, unlawful, fraudulent and/or other anti-competitive business practices. SM's intent to monopolize can be inferred from the nature of its illegal conduct, in both the number of its legal actions against Dryft and the complete lack of merit in each.

95.    SM's intent, power, and resources successfully monopolize the Relevant Market, or create a dangerous probability that it will succeed in monopolizing the Relevant Market, causing the significant anticompetitive consequences described above.

96.    SM's illegal conduct is not exempted from California's Cartwright Act or any other anti-trust law because it has sought to obtain that monopoly through

illegitimate means and for illegitimate purposes. In particular, if competitors (like Dryft) or their contractors or designated agents attempt to take a larger share of the market, SM files objectively baseless lawsuits, which have nothing to do with the legitimate goals of SM or the purpose of patent protection.

97.   By engaging in the foregoing conduct, SM intentionally and wrongfully violated California's Cartwright Act.

98.   SM's violation of the Cartwright Act was done knowingly, willingly, and flagrantly.

99.   SM's unlawful acts had, and continue to have, a substantial and foreseeable effect on California commerce by keeping prices of its NP Products artificially high, and by reducing consumer choice.

100.  SM's monopolist actions also affected both intrastate commerce and interstate commerce flowing in to or out from California and had direct, substantial, and reasonably foreseeable effects upon trade and commerce in California.

101.  As a proximate result of the wrongful acts herein alleged, Dryft has been damaged in an amount to be determined at trial.

## COUNT III – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

102.  Dryft incorporates all preceding paragraphs by reference.

103.  Dryft was, at all relevant times, one of a handful of providers of NP Products in the United States, other than SM.

104.  In January 2020, Dryft began negotiations with various potential third-party capital investors with the intention of obtaining additional capital to expand Dryft's presence in the Relevant Market, and to expand and improve its new domestic manufacturing facility.

105.  SM had actual knowledge that Dryft was negotiating with these potential third-party investors, or knew of such facts and circumstances, including Dryft's

September 2019 press release announcing its new manufacturing facility, that would have led a reasonable person to believe that this potential transaction existed.

106. By filing the legal actions against Dryft, SM knew or should have known that Dryft's relationship with these potential third-party investors would be disrupted to Dryft's detriment.

107. Once SM's groundless legal actions were filed against Dryft, most of the discussions and negotiations with potential third-party capital investors focused on the legal actions, and the cost and attention that Dryft would need to devote to defending them.

108. Prior to SM filing of the three legal actions, Dryft had an estimated valuation of $458 million.

109. Dryft did not obtain any capital investors, nor was it able to expand or provide additional investment for the business on its own, therefore Dryft decided to entertain strategic acquisition offers.

110. After the filing of the three legal actions, however, Dryft's value dropped to $150 million, the figure for which it was ultimately acquired by BAT.

111. As part of the negotiation of the acquisition, Dryft was required to indemnify BAT against any liability for the three sham legal actions.

112. SM monopolized and attempted to monopolize the United States market for NP Products through the foregoing actions.

113. SM's interference with Dryft's legitimate business expectations lacked any justification or excuse.

114. As a direct and proximate result of SM's legal actions against Dryft, Dryft was damaged because the costs and burdens of Dryft's participation in the Relevant Market dramatically increased, as it was distracted from its core business due to the legal actions, faced supplier and potential investor concerns, and had to pay significant legal fees. Because of the costs associated with SM's legal actions, Dryft was not in a position to further invest in the business itself, nor did it obtain capital

from outside investors, therefore Dryft pivoted strategically and agreed to entertain offers from potential acquirers, and it eventually accepted an offer from BAT at a significant discount. Dryft was valued at only $150 million by BAT because of the risk and significant costs presented by the groundless legal actions initiated by SM against Dryft.

115.  Because of SM's actions, Dryft suffered significant economic harm.

## DEMAND FOR JURY TRIAL

116. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Dryft demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Dryft respectfully requests that this Court:

(a) On Count One, enter judgment in Dryft's favor, and against Defendant SM, declaring that SM violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(b) On Count Two, enter judgment in Dryft's favor, and against Defendant SM, declaring that SM is liable for intentional interference with a prospective economic advantage;

(c) Award Dryft treble damages of $1.2 billion dollars representing the difference in price that Dryft was valued before and after the sham legal actions commenced, as well as the estimated value that Dryft would have achieved had SM not unlawfully attempted to monopolize the Relevant Market, and unlawfully interfered with Dryft's business practices, as well as attorney's costs and fees.

(d) Award Dryft additional relief that the Court deems just and appropriate.

///

///

///

///

///

///

DATED:  August 2, 2022                    **GREENBERG TRAURIG, LLP**


By: */s/ David S. Bloch*

　　David S. Bloch
blochd@gtlaw.com
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105
Telephone: 415.590.5110
Facsimile: 415.707.2010

*Attorneys for Dryft Sciences, LLC*